# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **RACHEL LYNN CANNADY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:19-cv-00609-HFS** |
| | ) | |
| **HY-VEE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Rachel Cannady worked at the Lee's Summit #2 Hy-Vee store from December 2011 until she resigned in September 2018. She initially worked in the Kitchen and transferred to the Bakery Department in June 2017. Plaintiff claims that Bakery Manager Mitch Simmons treated her well until a day in the spring of 2018 when Mr. Simmons asked Plaintiff if she "hooked up with all her bosses." Plaintiff told him she did not. Plaintiff claims, after that day, Mr. Simmons mistreated her to the point that she felt compelled to resign. Based on these allegations, Plaintiff has asserted claims of sexual harassment and retaliation.

As described more fully below, even assuming the truth of Plaintiff's testimony, her claims fail as a matter of law. The "facts" Plaintiff presents, which Hy-Vee accepts for purposes of this Motion, establish that Mr. Simmons was a highly disliked and erratic boss. He yelled at his employees, held them to impossible standards, set them up to fail, and unfairly criticized them. But he did this to all of the Bakery employees. Mr. Simmons' behavior – assuming the truth of Plaintiff's testimony – was directed at males and females alike, and was directed at Plaintiff both before and after she allegedly rejected his advances.

Beyond that, Plaintiff cannot show that she suffered any tangible employment action,

which is fatal to both her *quid pro quo* harassment claim and her retaliation claim. Moreover, Plaintiff did not engage in any protected activity until after she resigned, and even then, Mr. Simmons was unaware of it.

For these reasons, as more fully described below, even assuming that the conduct occurred exactly as Plaintiff alleges, she cannot establish any actionable claim against Hy-Vee, and Hy-Vee is entitled to summary judgment on those claims.

In addition, Plaintiff destroyed important evidence after she knew of her plan to sue Hy-Vee. Specifically, Plaintiff destroyed recorded calls and text messages that go to the heart of her claims. Plaintiff's spoliation justifies dismissing her claims, or – at the very least – granting Hy-Vee all favorable inferences regarding the destroyed evidence. Assuming the destroyed evidence would further illustrate that Mr. Simmons' behavior was directed at all employees, the fact that Hy-Vee is entitled to judgment as a matter of law becomes even more clear.

**<u>TABLE OF CONTENTS</u>**

**PAGE**

I.  STATEMENT OF UNCONTROVERTED FACTS ......................................................... 1

    A.  Background. ................................................................................................... 1

    B.  Relevant Witnesses. ..................................................................................... 2

    C.  Mitch Simmons' Difficult Management Style. ............................................ 3

    D.  Specifics Regarding Simmons' Management Style, Treatment of
        Employees and Timeline of Events. ........................................................... 4

        1.  Mitch Simmons Offered to Buy Plaintiff a Drink. ....................... 6

        2.  Anna Cook's Complaint. ................................................................ 7

    E.  Plaintiff's Difficulties After Beginning the Affiliate Program and
        Allegations of Mistreatment. ....................................................................... 9

    F.  Alleged Sexual Harassment. ...................................................................... 25

    G.  Alleged Retaliation. ................................................................................... 27

    H.  Plaintiff's Spoliation of Evidence. ............................................................ 27

    I.  Other Miscellaneous Facts. ....................................................................... 29

II. ARGUMENT ........................................................................................................ 31

    A.  SUMMARY JUDGMENT STANDARD. .................................................. 31

    B.  HY-VEE IS ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFF'S SEXUAL HARASSMENT CLAIM. ................................ 31

        1.  Plaintiff cannot prove hostile work environment sexual
            harassment. ................................................................................... 32

            a.  Even assuming the truth of Plaintiff's testimony, the vast
                majority of Mr. Simmons' alleged conduct was not gender-
                based. ................................................................................. 33

            b.  The gender-specific conduct about which Plaintiff
                complains was not sufficiently severe or pervasive to affect
                a term, condition, or privilege of Plaintiff's employment. .......... 35

i

2.      Plaintiff cannot prove *quid pro quo* sexual harassment because she did not suffer any adverse employment action. ....................................... 38

C.      HY-VEE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM. ........................................................... 42

III.      PLAINTIFF'S SPOLIATION OF EVIDENCE JUSTIFIES SUMMARY JUDGMENT IN FAVOR OF HY-VEE ........................................................................ 43

IV.      CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alagna v. Smithville R-II Sch. Dist.*,
324 F.3d 975 (8th Cir. 2003) ...................................................................52, 54, 55

*Alhalabi v. Missouri Dep't of Nat. Res.*,
300 S.W.3d 518 (Mo. Ct. App. 2009)..................................................................50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................................................46

*Blockmon v. SW Bell Tel. Co.*,
Case No. 1716-CV14128 (Jackson Cty. Circuit Ct., judgment entered April
21, 2020) .............................................................................................................58

*Bram v. AT&T Mobility Servs., LLC*,
564 S.W.3d 787 (Mo. Ct. App. 2018)..................................................................58

*Breeding v. Arthur J. Gallagher and Co.*,
164 F.3d 1151 (8th Cir. 1999) .......................................................................48, 55

*Brown v. Therapy Mgmt. Corp.*,
No. 4:17-cv-01247-JAR, 2019 U.S. Dist. LEXIS (E.D. Mo. May 9, 2019)...........57

*Calvin v. City of Laurie*,
No. 2:11-CV-04124, 2012 U.S. Dist. LEXIS 164800 (W.D. Mo. Nov. 19,
2012) ...................................................................................................................46

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................................46

*Cooper v. Albacore Holdings, Inc.*,
204 S.W.3d 238 (Mo. Ct. App. 2006)..................................................................50

*Cross v. Prairie Meadows Racetrack and Casino, Inc.*,
615 F.3d 977 (8th Cir. 2010) ...............................................................................53

*Davidson & Assocs. v. Jung*,
422 F.3d 630 (8th Cir. 2005) ...............................................................................46

*DeWalt v. Davidson Serv./Air, Inc.*,
398 S.W.3d 491 (Mo. Ct. App. 2013)..................................................................54

*Duncan v. GMC*,
300 F.3d 928 (8th Cir. 2002) ...........................................................48, 52, 53, 54

iii

*EEOC v. CRST Van Expedited, Inc.*,
  679 F.3d 657 (8th Cir. 2012) ................................................................................53

*Ellett v. Big Red Keno, Inc.*,
  Nos. 98-3046, 98-3694, 2000 U.S. App. LEXIS 17583 (8th Cir. July 21, 2000)
  (unpublished) ........................................................................................................48

*Fassett v. Vendtech-SGI, LLC*,
  No. 16-01221-CV-W-ODS, 2018 U.S. Dist. LEXIS 18902 (W.D. Mo. Feb. 6,
  2018) ......................................................................................................................57

*Hesse v. Avis Rent A Car Sys.*,
  394 F.3d 624 (8th Cir. 2005) ................................................................................50

*Hoaglin v. Hy-Vee Inc.*,
  No. 6:18-03262-CV-RK, 2019 U.S. Dist. LEXIS 77607 (W.D. Mo. May 8,
  2019) ................................................................................................................47, 53

*Kader v. Bd. of Regents of Harris-Stowe State Univ.*,
  565 S.W.3d 182 (Mo. 2019) ..................................................................................58

*Knowles v. Citicorp Mortg., Inc.*,
  142 F.3d 1082 (8th Cir. 1998) ..............................................................................54

*LeGrand v. Area Res. For Cnty. & Human Servs.*,
  394 F.3d 1098 (8th Cir. 2005) ..................................................................47, 51, 52

*Linville v. Sears, Roebuck & Co.*,
  335 F.3d 822 (8th Cir. 2003) ................................................................................53

*Mills v. St. Louis Cnt'y Gov't*,
  No. 4:17-CV-0257-PLC, 2018 WL 3208581 (E.D. Mo. June 29, 2018)................54

*Moyers v. Ford Motor Co.*,
  941 F. Supp. 883 (E.D. Mo. 1996)........................................................................60

*Philips v. Taco Bell Corp.*,
  156 F.3d 884 (8th Cir. 1998) ................................................................................55

*Quigley v. Winter*,
  598 F.3d 938 (8th Cir. 2010) ................................................................................53

*Schoffstall v. Henderson*,
  223 F.3d 818 (8th Cir. 2000) ................................................................................50

*Scusa v. Nestle U.S.A. Co.*,
  181 F.3d 958 (8th Cir. 1999) ................................................................................51

*Smith v. Hy-Vee, Inc.*,
  622 F.3d 904 (8th Cir. 2010) ........................................................48

*Stafford v. Mo.*,
  835 F. Supp. 1136 (W.D. Mo. 1993) ..............................................57

*Tatum v. Ark. Dep't of Health*,
  411 F.3d 955 (8th Cir. 2005) ........................................................54

*Thomas v. Corwin*,
  483 F.3d 516 (8th Cir. 2007) ........................................................46

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) ......................................................46

*Watson v. Heartland Health Labs., Inc.*,
  2014 U.S. Dist. LEXIS 66078 (W.D. Mo. May 14, 2014) ..............51

*Watson v. Heartland Health Labs., Inc.*,
  790 F.3d 856 (8th Cir. 2015) ........................................................47

*Wiatt v. Speed Control, Inc.*,
  2002 U.S. Dist. LEXIS 11869 (N.D. Iowa June 28, 2002)..............60

*Wilson v. Int'l Bus. Mach. Corp.*,
  62 F.3d 237 (8th Cir. 1995) ..........................................................46

## Other Authorities

Fed. R. Civ. P. 56(a) ..........................................................................46

# I.    STATEMENT OF UNCONTROVERTED FACTS[1]

## A.    Background.

1.    Plaintiff began working for the Hy-Vee store known as Lee's Summit #2 in December 2011. Ex. 1, Pltf's depo. 49:19- 50:1.

2.    Plaintiff started in the Kitchen, where Mike Moore was the manager. Ex. 1, Pltf's depo. 49:7-50:4.

3.    In October 2012, Plaintiff became a full-time Kitchen employee, and she stayed there until June 5, 2017. Ex. 1, Pltf's depo. 49:19-50:15.

4.    During her time in the Kitchen, Plaintiff received multiple employee consultation forms related to her attendance and work attitude. Ex. 2, (Depo. Ex. 22-28); Pltf's depo. 72:8-12, 73:12-74:19, 78:7-79:16

5.    Plaintiff has no complaints about the way she was treated when she worked in the Kitchen. Ex. 1, Pltf's depo. 51:13-15.

6.    Plaintiff wanted to work in the Bakery because she loves to bake. The donut finisher position also paid more. Ex. 1, Pltf's depo. 50:12-25.

7.    Accordingly, when the store posted an opening for a donut finisher in the Bakery, Plaintiff told the Store Director, Jeff Sesker, she was interested in that position, and he offered her the position. Ex. 1, Pltf's depo. 50:12-51:12.

8.    As a donut finisher, Plaintiff worked overnight hours. Ex. 1, Pltf's depo. 52:21-25.

9.    Specifically, from June 2017 through the middle of December 2017, Plaintiff typically began her shifts between 9:00 p.m. and 10:00 p.m. and worked until 6:00 a.m. or 7:00

---

[1] For purposes of this Motion, Hy-Vee assumes the truth of Plaintiff's testimony and has presented the "facts" in the light most favorable to Plaintiff. In actuality, Hy-Vee disputes many of the facts Plaintiff has asserted in this case and reserves the right to put on its own evidence at trial if the Court denies this Motion in whole or in part.

a.m. Ex. 1, Pltf's depo. 53:1-6; Ex. 3, Pltf's Time Records; Ex. 4, Declaration of Aimee Douthit ("Douthit Decl.") at ¶ 25.

10.     Plaintiff worked those hours, along with the other donut finishers, Cale Suppes, and Anna Cook. Ex. 1, Pltf's depo. 53:7-17; Ex. 5, Excerpts from the deposition of Cale Suppes ("Suppes depo.") 18:4-7.

**B.     Relevant Witnesses.**

11.     Following is a list of employees referenced in this Statement of Facts for ease of reference:

| Name | Position at the Time |
|---|---|
| Jeremy Blanton | Bakery Employee |
| Anna Cook | Bakery Employee |
| Aimee Douthit (previously Fadler) | Human Resources Manager beginning January 2018 |
| Jordan Eslick | Manager of Perishables |
| Linda Green | Bakery Employee |
| Karen Hocek | Bakery Employee |
| Alan Jordan | Bakery Employee |
| Doug McKee | Manager of Perishables |
| Mike Moore | Kitchen Manager |
| Irene Petrucci | Bakery Employee |
| Jila Rajabi | Bakery Employee |
| Jeff Sesker | Store Director |
| Mitch Simmons | Bakery Manager |
| Jamie Stewart | Bakery Employee |

| Cale Suppes | Bakery Employee |
|---|---|
| Rick Whyle | Bakery Employee |

Ex. 4, Douthit Decl. ¶¶ 3, 6-9.

### C. Mitch Simmons' Difficult Management Style.

12.     Mitch Simmons became the Bakery Manager in July 2017. Ex. 6, Excerpts from the deposition Mitchell Simmons ("Simmons depo.") 27:11-17.

13.     Before Mr. Simmons, Irene Petrucci was the Bakery Manager. Ex. 7, Declaration of Jeff Sesker ("Sesker Decl.") at ¶ 3.

14.     Jeff Sesker removed Ms. Petrucci from that position because Ms. Petrucci was not holding her employees accountable. Ex. 7, Sesker Decl. ¶ 4.

15.     When Mr. Simmons began, Mr. Sesker explained to him that Mr. Sesker expected Mr. Simmons to hold his employees accountable and to reduce the number of labor hours in the department. Ex. 7, Sesker Decl. ¶ 5.

16.     Mr. Sesker explained that he believed there were employees who were not performing well enough to remain employed and that Mr. Simmons should identify those employees and make changes as needed. Ex. 7, Sesker Decl. ¶ 6.

17.     When Mr. Simmons began, Jeremy Blanton and Rick Whyle worked as bakers in the department. Ex. 1, Pltf's depo. 55:3-5; Ex. 4, Douthit Decl. ¶ 8.

18.     Within a few months of Mr. Simmons beginning as Bakery Manager, Mr. Whyle and Mr. Blanton both left because they butted heads with Mr. Simmons. Ex. 1, Pltf's depo. 282:14-283:25; Ex. 4, Douthit Decl. ¶ 11.

19.     As time continued, Mr. Sesker and Ms. Douthit received complaints about Mr. Simmons from numerous employees, including Plaintiff, Cale Suppes, Alan Jordan, Anna Cook, Jila Rajabi, and Bridget Kavanaugh. Ex. 8, Excerpts from the deposition of Aimee Douthit

("Douthit depo.") 41:10-20, 56:23-57:8; Ex. 9, Excerpts from the deposition of Jeff Sesker ("Sesker depo.") 29:9-15, 56:1-6; Ex. 6, Simmons depo. 30:9-31:9.

20.     Because Mr. Sesker expected Mr. Simmons to hold his employees accountable and make necessary changes, he was not surprised some employees complained. Nonetheless, Mr. Sesker wanted Mr. Simmons to treat employees with respect. As such, he met with Mr. Simmons on more than one occasion to coach him on his management style. Ex. 9, Sesker depo. 62:11-63:15; Ex. 7, Sesker Decl. ¶ 7; Ex. 6, Simmons depo. 20:20-25, 34:21-24.

**D.     Specifics Regarding Simmons' Management Style, Treatment of Employees and Timeline of Events.**

21.     In August 2017, Mr. Simmons did not schedule enough help. As a result, Jeremy Blanton did not have time to cut the donuts. According to Plaintiff, Mr. Simmons was "totally pissed" at Mr. Blanton, even though it was not Mr. Blanton's fault. Ex. 10, Texts between Plaintiff and Petrucci at CANNADY 28.

22.     On the same night, Cale Suppes told Plaintiff he wanted to quit. Mr. Suppes informed Plaintiff that he was going to tell Mr. Simmons he was going to look for another job if Mr. Simmons did not train them better. *Id.*; Ex. 1, Pltf's depo. 124:19-125:10.

23.     On August 6, 2017, Mr. Simmons made Plaintiff feel stupid "once again" by telling her she was the reason the donuts look bad. *Id.*

24.     On that same night, Plaintiff expressed her frustration that they could not complete their job duties without going over the amount of scheduled hours. "So are we supposed to leave our messes and expect not to get yelled at?" *Id.*

25.     On August 10, 2017, Plaintiff exchanged text messages with Cale Suppes about their frustrations with Mr. Simmons. Among other things, Plaintiff told Mr. Suppes that if upper managers talk to him about something he did wrong, "thats [sic] the perfect time to tell them all

the bull shit thts [sic] beein going on with mitch." Ex. 11, CANNADY 45; Ex. 1, Pltf's depo. 128:18-129:20.

26. On September 8, 2017, Plaintiff complained to Ms. Petrucci in a text message about Mr. Simmons, noting he claimed things would get better, but it was worse.[2] Ex. 12, CANNADY 31.

27. On September 16, 2017, Plaintiff sent the following text message to Ms. Petrucci: "I literally can't work for mitch, I can't do it. I'll explain tomorrow, but I think ima apply at lees summit 1." Ex. 13, CANNADY 32; Ex. 1, Pltf's depo. 132:14-133:25.

28. Ms. Petrucci told Plaintiff that she and the other employees should raise these issues with other managers in the store. She further stated: "I honestly don't think Mitch knows how he is and how difficult he can be to work with. Maybe a little meeting will open his eyes and give jeff a heads up for what he needs to be watching." Ex. 14, CANNADY 33.

29. Ms. Petrucci also commented that Mr. Simmons' bed side manner is "rough." Ex. 15, CANNADY 4.

30. In late December 2017, Plaintiff started working day time hours, typically beginning at 7:00 a.m. and ending in the afternoon. Ex. 3, Pltf's time records.

31. Her hours changed because Mr. Simmons had asked Plaintiff to be the assistant manager and began training her on other tasks. Ex. 1, Pltf's depo. 130:7-15; Ex. 16, Declaration of Mitchell Simmons ("Simmons Decl.") ¶ 5.

32. Mr. Simmons also spoke to Plaintiff about getting into the affiliate program, which is a training program aimed at developing employees so they can become department managers. Ex. 1, Pltf's depo. 130:7-15, 137:22-138:8; Ex. 7, Sesker depo. 26:24-27:3.

---

[2] Because Plaintiff did not preserve her text messages, we are unable to see this complete message.

33.     Hy-Vee provides a large book that the employees in the program are supposed to complete over six to nine months. Ex. 1, Pltf's depo. 138:22-140:22.

34.     On January 3, 2018, Plaintiff, Mitch Simmons, and Jeff Sesker all signed the application for Plaintiff to enter the affiliate program (also known as the School of Retail Management). Ex. 17, Application form (Depo. Ex. 52); Ex. 1, Pltf's depo. 217:25-218:16.

35.     Dawanda Smith, a former Bakery employee, left in January 2018. Ex. 4, Douthit Decl. ¶ 12. She told Plaintiff she was leaving because she was frustrated that she was being pushed really hard to learn a lot of things in a short amount of time. Ex. 1, Pltf's depo. 249:6-14. Plaintiff never saw Mr. Simmons do anything inappropriate to her. *Id.* at 249:6-17.

### 1.     Mitch Simmons Offered to Buy Plaintiff a Drink.

36.     Plaintiff's nephew passed away on January 19, 2018. Ex. 1, Pltf's depo. 235:4-24. Plaintiff called in to work to explain she would not be there that day. Plaintiff first talked to Irene Petrucci. Ex. 1, Pltf's depo. 82:7-83:19.

37.     Later, Mitch Simmons called Plaintiff. He asked Plaintiff if she was okay, asked her if she needed anything, and asked her when she would be back at work. Ex. 1, Pltf's depo. 82:7-13.

38.     Mr. Simmons then told Plaintiff if she wanted to go have drinks with him sometime, that he could and that his wife would be out of town that weekend, and he'd be by himself. Plaintiff declined, and Mr. Simmons said, okay. Mr. Simmons then asked again if Plaintiff needed anything and said the offer still stands. Ex. 1, Pltf's depo. 82:7-18.

39.     Plaintiff felt Mr. Simmons was trying to suggest something other than just drinks as friends because he threw in that his wife would be out of town. Ex. 1, Pltf's depo. 84:11-17.

40.     Mr. Simmons did not indicate where he wanted to have drinks. Ex. 1, Pltf's depo.

84:18-20.[3]

41.     As discussed below, Plaintiff had a recording of this conversation but did not preserve it. Ex. 1, Pltf's depo. 277:19-281:1.

### 2.     Anna Cook's Complaint.

42.     In the fall of 2017, Mr. Simmons made Plaintiff the lead on the overnight shift, which meant she had some supervisory responsibility over Anna Cook and Cale Suppes. Ex. 1, Pltf's depo. 273:7-9; Ex. 3, Pltf's time records; Ex. 16, Simmons Decl. at ¶ 4.

43.     When Plaintiff was the lead, she had to write Anna Cook up more than once because Ms. Cook copped an attitude with Plaintiff multiple times. Plaintiff tried to talk to her about it, and Ms. Cook did not like that conversation, so Plaintiff wrote her up. Ex. 1, Pltf's depo. 273:20-274:16.

44.     Ms. Cook also talked to Plaintiff about not wanting to work nights. Ex. 1, Pltf's depo. 274:17-19. Ms. Cook told Plaintiff she wanted to change departments so she could work days, but there were no open positions. *Id*. at 274:24-275:4.

45.     When Plaintiff worked with Ms. Cook, Ms. Cook's husband came to the department fairly frequently and stayed there for long periods of time. Ex. 1, Pltf's depo. 275:5-10.

46.     There were times when Ms. Cook should have been working but instead stopped to talk to her husband. Plaintiff had to coach Ms. Cook about that as well. Ex. 1, Pltf's depo. 275:11-18.

47.     Ms. Cook rarely worked with Mitch Simmons because she worked nights and was almost always gone by the time Mr. Simmons arrived at work. Ex. 1, Pltf's depo. 145:16-146:23.

48.     In February 2018, Anna Cook made a complaint about Mitch Simmons to Aimee

---

[3] Plaintiff's charge of discrimination states that Mr. Simmons asked Plaintiff to go to his house, but Plaintiff denied that in her deposition. Ex. 1, Pltf's depo. 84:18-20.

Douthit. Ex. 4, Douthit Decl. ¶ 13.

49.     Ms. Cook informed Ms. Douthit that Mr. Simmons was demeaning and condescending. She stated that he yelled at her in front of customers and made her feel stupid when she asked questions. Ex. 18, Douthit notes; Ex. 8, Douthit depo. 26:15-20; 27:7-14; Ex. 4, Douthit Decl. ¶ 15.

50.     Ms. Cook also told Ms. Douthit she did not feel safe in the department because she worked over nights. Ex. 18, Douthit Notes; Ex. 8, Douthit depo. 26:24-27:6 Ex. 4, Douthit Decl. ¶ 15.

51.     Later, Ms. Cook reported that Mr. Simmons was verbally abusive and talked down to her. She stated he was belittling, did not care about the donut program, and set them up for failure. She indicated she thought Mr. Simmons was trying to get her to quit, and she thought it was a hostile work environment, but also stated she had not communicated with Mr. Simmons in two months. Ex. 19, Sesker notes; Ex. 9, Sesker depo. 59:22-60:1; 61:15-21; Ex. 7, Sesker Decl. ¶ 8.[4]

52.     Aimee Douthit and Jeff Sesker investigated Ms. Cook's complaint by speaking with Plaintiff and Cale Suppes, the other two employees who worked with Ms. Cook in the donut frying program. Ex. 8, Douthit depo. 34:21-24; Ex. 4, Douthit Decl. ¶ 14.

53.     They interviewed Plaintiff on February 10, 2018. Ex. 19, Sesker Notes, Ex. 7, Sesker Decl. ¶ 10.

54.     Among other things, Plaintiff informed them that Ms. Cook tended to overreact. She stated Ms. Cook did not work at the same time as Mr. Simmons, so they did not interact. Plaintiff also stated she did not believe it was a hostile work environment, and that she had not

---

[4] The last set of notes in Jeff Sesker's notes contains a clerical error. It should say "2" (February) instead of "10" (October). Ex. 9, Sesker depo. 61:3-14.

witnessed Mr. Simmons swearing. Ex. 19, Sesker Notes (Exhibit 39 from Plaintiff's depo); Ex. 7, Sesker Decl. ¶ 10; Ex. 1, Pltf's depo. 149:19-152:12.

55.     Cale Suppes informed Mr. Sesker and Ms. Douthit that Ms. Cook was argumentative and not a good employee. Mr. Suppes stated that Ms. Cook's husband frequently comes to the department when Ms. Cook is working, and Ms. Cook stops working until he leaves. He stated he had not seen Mr. Simmons swear or be unfair to Ms. Cook. Ex. 18, Douthit notes; Ex. 4, Douthit Decl. ¶ 15.

56.     Based on their investigation, Ms. Douthit and Mr. Sesker concluded that Ms. Cook's complaint was not justified. Ex 4, Douthit Decl. ¶ 16. The two employees who worked directly with Ms. Cook contradicted the information she gave. *Id.*

57.     Nonetheless, they offered to help Ms. Cook find a position at another store since she indicated she did not want to work with Mr. Simmons, but Ms. Cook never took them up on the offer. Ex. 9, Sesker depo. 62:7-11.

**E.      Plaintiff's Difficulties After Beginning the Affiliate Program and Allegations of Mistreatment.**

58.     Plaintiff officially entered the affiliate program on March 5, 2018. Ex. 20, 3/1/18 Email (Pltf's Depo. Ex. 54); Ex. 1, Pltf's depo. 219:22-220:10.

59.     Plaintiff began taking notes the next day, March 6, 2018. Ex. 21, Pltf's notes.[5] She kept the notebook at her house and took the notes when she got home at the end of the day that the note is dated. Ex. 1, Pltf's depo. 169:3-25.

60.     The purpose was to write down what was happening every day. Ex. 1, Pltf's depo. 160:13-16.

---

[5] Exhibit 21 contains a complete non-duplicative copy of the notes Plaintiff produced in this case. The original copy had duplicates, which Hy-Vee has removed. In addition, two of the pages in the original production were illegible. Plaintiff subsequently produced legible copies, which are included in Exhibit 21.

61.     As part of the affiliate program, Plaintiff took on significantly more responsibility, and she was responsible for learning all aspects of the department. Ex. 16, Simmons Decl. ¶ 7.

62.     Once that happened, Mr. Simmons observed that Plaintiff began struggling, and their relationship became strained. Ex. 16, Simmons Decl. ¶ 8.

63.     Plaintiff's co-workers also observed that Plaintiff began to struggle when she switched to day time hours. Ex. 5, Suppes depo. 19:14-20:10.

64.     In early March, Mr. Simmons was rude to Plaintiff. He criticized her about how she did displays and how she managed employees. Specifically, he criticized the way she displayed the items, the way they were positioned, the way the direction she had them, and the place she put them. Ex. 1, Pltf's depo. 96:17-97:25.

65.     He also indicated that Plaintiff was not making sure the other employees were attending to customers or cleaning up correctly. *Id.* 98:1-13.

66.     According to her notes, on March 6, 2018, Mr. Simmons was upset because Plaintiff had made dough incorrectly. Plaintiff had not made it before, and when she asked questions, Mr. Simmons talked to her like she was stupid. They had an argument, but they worked it out, and it was fine. Ex. 21, Pltf's notes.

67.     On March 7, 2018, Mr. Simmons left Plaintiff a long list, and she felt like she had to complete it, or she would be in trouble. Ex. 21, Pltf's notes.

68.     On March 12, 2018, Mr. Simmons was in a good mood. He told Plaintiff she did a good job and had everything looking good. Ex. 21, Pltf's notes.

69.     On March 14, 2018, Mr. Simmons asked Plaintiff to come to work on her day off because his boss was coming in. Plaintiff agreed to come in, and Mr. Simmons gave her a huge list and complained that she did everything wrong. Ex. 21, Pltf's notes.

70.     On March 18, 2018, Mr. Simmons called Plaintiff and told her to get banana bread started and finished before Mr. Simmons got to the store, so Plaintiff did that but then Mr. Simmons yelled at her for not merchandising. Plaintiff's notes state: "He was a complete dick to me **and everyone else** all day." Ex. 21, Pltf's notes (emphasis added).

71.     In March 2018, Plaintiff contacted the owner of Salvatore's restaurant, Sam Garozzo, and told him she wanted to move on from Hy-Vee and needed a place to work. Ex. 1, Pltf's depo. 31:7-20.[6]

72.     Mr. Garozzo told Plaintiff she was more than welcome to start working for him at any time. Ex. 1, Pltf's depo. 31:21-23.

73.     On March 18, 2018, Plaintiff sent a text message to Ms. Petrucci that states, in part:

> Ya of course we are okay,[7] I will always love you just the same Jo [sic] matter what **just like I care about Mitxh [sic] just the same no matter what arguments Me and him get into**, I just feel like as a leader he needs to not come in with such a harsh attitude Zhe [sic] didn't even tell **ppl** good morning or hello he just started being all aggressive, **it doesn't make anyone want to work harder when he treats ppl badly**, and it's not like this is a one time thing he's always like this for the most part, ya he had days where he is nice bit [sic] his bad days out weigh his good, and he has a reputation for being a dick to **ppl**.

Ex. 22, CANNADY 5 (emphasis added).

74.     Plaintiff spoke with Aimee Douthit about Mr. Simmons that day (March 18, 2018). Ex. 21, Pltf's notes; Ex. 1, Pltf's depo. 165:12-14.

75.     And things improved for about a week. Ex. 1, Pltf's depo. 98:14-99:9.

76.     Plaintiff's notes from March 23, 2018 state:

> I got my papers sent in on my book and started working on it. **Mitch was kinda in a good mood** but was bitching about Jeff and said he can't stand

---

[6] Plaintiff claims she first spoke with someone from Salvatore's in January 2018. At that time, Becky Garozzo, the wife of the owner of Salvatore's, told Plaintiff she had heard a lot about her and wanted Plaintiff to come work for them. *Id.* at 35:7-19.

[7] Plaintiff was responding to a message that she did not preserve. Ex. 1, Pltf's depo. 154:23-155:2.

> how he's always on his ass about gross, and that when I become a manager
> to not let people like him get to me. **I think he just hates everybody** and
> **that's why he treats all of us so badly**. He told me he also takes pills for
> bipolar. So that explains so much. I like Jeff so I don't' know what to say
> when he says negative things.

Ex. 21, Pltf's notes (emphasis added).

77.     On March 26, 2018, Plaintiff's notes state that Mr. Simmons did not leave her a

list, so she tried to do what she thought she should do, but Mr. Simmons had not taught her how

to make a good production list yet. Mr. Simmons told her she did not do well, but she did not know

how she was supposed to learn if he did not show her. She notes she was very frustrated. Ex. 21,

Pltf's notes.

78.     In late March 2018, Plaintiff was talking to Mike Moore, who often came over to

ask how things were going in the Bakery. When Mr. Moore left, Mr. Simmons leaned over

Plaintiff, asked if Plaintiff hooked up with all her bosses and kind of laughed. Plaintiff looked at

him, confused, and said, "No." Mr. Simmons then asked, "Are you sure?" Plaintiff told him she

was sure, and Mr. Simmons then laughed and walked on. Ex. 1, Pltf's depo. 88:18-89:10.[8]

79.     When Mr. Simmons asked the question, he had a playful, laughing sort of tone. Ex.

1, Pltf's depo. 92:20-23.

80.     Plaintiff did not document this incident in her notes until April 30, 2018. Ex. 21,

Pltf's notes.

81.     Plaintiff's notes on March 30, 2018 state:

> I am so tired of Mitch bringing **me and other people** down. He never talks
> to me **or anyone** with respect. He argued with a customer today and was so

---

[8] Plaintiff initially testified this conversation occurred in early April. Ex. 1, Pltf's depo. 89:7-13. She then said it was either early April or late March. *Id.* at 89:18-19. Then she said she was sure it was April. *Id.* at 90:12-15. Plaintiff's charge of discrimination indicates the incident occurred in late March, and after giving Plaintiff time to review her notes, Plaintiff testified it is her best memory that the incident occurred in late March. Ex. 1, Pltf's depo. 237:7-242:24. Later in her deposition, Plaintiff's counsel asked to take a break before she began asking questions. After the break, Plaintiff changed her testimony to state that it was possible the incident occurred in early March 2018. Ex. 1, Pltf's depo. 301:10-303:1.

rude to them. He complains about Jordan and Jeff all day long and I'm so sick of it. Always says how much he wants to kill Jordan. He's not very smart to say that.

Ex. 21, Pltf's notes (emphasis added).

82.     Mr. Simmons nitpicked Plaintiff and lashed out at her if she went to him with a concern or asked a question. Ex. 1, Pltf's depo. 108:7-18.

83.     Mr. Simmons nitpicked Plaintiff by telling her she was rolling the bread wrong, criticizing the way she put bread on the sheets, and criticizing the way Plaintiff measured things, put them in the bowl, and mixed them. He told her she did things wrong even when she had done them the way he had instructed. Ex. 1, Pltf's depo.108:19-109:13.

84.     Mr. Simmons also talked down to Plaintiff in front of other employees and made her feel like she should not be an assistant manager. Ex. 1, Pltf's depo. 110:11-111:4.

85.     Mr. Simmons talked to Plaintiff in a condescending way, as if she were a child. He also asked her to do things even when she was busy and others were not. Ex. 1, Pltf's depo.111:5-22.

86.     Plaintiff complained to Aimee Douthit about Mr. Simmons again in April 2018. She told Ms. Douthit she did not want to work in the Bakery anymore. Plaintiff said she was tired of going home crying, and she should not have to work like that every day. Ex. 1, Pltf's depo. 102:14-103:3.

87.     Ms. Douthit said she understood and would talk to Jeff Sesker, the Store Director. Ex. 1, Pltf's depo. 103:4-6. Ms. Douthit further stated that they would have a meeting with Mr. Simmons, and everything would be taken care of. Ex. 1, Pltf's depo. 103:10-19.

88.     Soon after this conversation, Mr. Simmons was called to a meeting. Ex. 1, Pltf's depo. 103:16-104:17.

89.     Ms. Douthit later came to talk to Plaintiff and told Plaintiff that while they were

meeting with Mr. Simmons about his behavior, Mr. Simmons' dad called and asked Ms. Douthit and the other manager to leave the room. Plaintiff does not know what happened after that, but says Mr. Simmons came out smiling. Ex. 1, Pltf's depo. 104:18-105:1.

90.     Plaintiff makes no mention of any of these alleged events in her notes. Ex. 21, Pltf's notes.

91.     On April 15, 2018, Plaintiff's notes indicate that she worked overnight with Mr. Simmons, and he bitched at her all day. She felt like she was not learning because he does not teach her in a productive way. She stated she was lost and confused because when she does what he wants, he changes his mind. Ex. 21, Pltf's notes.

92.     In late April, Mr. Simmons called Plaintiff and complained about some of Plaintiff's co-workers and how no one listened to him. Mr. Simmons said Plaintiff was the only one he could talk to about anything because Plaintiff understood what he wanted in the Bakery. Ex. 1, Pltf's depo. 85:19-86:3, 88:4-6, 90:4-91:15.

93.     Mr. Simmons said he had had a couple beers and he was sorry for ranting. He then said that if Plaintiff wanted to come have a couple beers with him, she could. Ex. 1, Pltf's depo. 86:4-7.

94.     Plaintiff said she was okay and that she was not a big drinker. Mr. Simmons said that was fine and then went on to rant about the employees. Ex. 1, Pltf's depo. 86:8-13.[9]

95.     Plaintiff was at the store at the time, walking out to go to her car. Ex. 1, Pltf's depo. 86:14-17. Plaintiff does not know where Mr. Simmons was, but he was not at work. *Id.* at 87:23-88:3.

96.     Plaintiff made no reference to this incident in her notes. Ex. 21, Pltf's notes.

---

[9] Mr. Simmons was ranting about Alan (Jordan), Irene (Petrucci), and Jeff Sesker. Ex. 1, Pltf's depo. 87:1-3.

97. In April 2018, former Bakery Manager Irene Petrucci gave advice to both Plaintiff and Cale Suppes about how to handle their frustrations with Mr. Simmons, advising them to breathe and be calm, rather than "give him the satisfaction of being upset or angry." Ex. 25, CANNADY 8 (Depo. Ex. 40, p.4); Ex. 1, Pltf's depo. 157:22-158:18.

98. On April 30, 2018, Plaintiff's notes state:

> Came in to do donuts but was not able to get it all done by 5 am, and of course Mitch was mad, but even Irene said he gave me a task that he himself couldn't get done in that time and he didn't do half the stuff he had me doing. Cale said that when he told Mitch my test results came back positive for cancer[10] that he said, "Oh well not my problem." I went to Jeff to express my concern. Jordan and Mitch took me into the education room without Jeff and pretty much got nowhere and for the rest of the day Mitch was really rude to me and Cale said when I left he talked shit on me for the rest of his shift.

Ex. 21, Pltf's notes.

99. Plaintiff testified that when she met with Mr. Sesker she told him she felt uncomfortable in the department, and she wanted to switch departments if not stores. Mr. Sesker told her he really wanted her to continue working in the Bakery so she could move up in the affiliate program and become a Bakery Manager. Mr. Sesker told Plaintiff she was doing a really good job, and he admired her work. Ex. 1, Pltf's depo. 116:23-117:25.

100. Mr. Sesker said they should talk to Mr. Simmons together, which was planned for the next day. Ex. 1, Pltf's depo. 118:5-9. Plaintiff testified that, based on her notes, this conversation with Mr. Sesker must have occurred on April 29, 2018. Ex. 1, Pltf's depo. 170:11-15.

101. When Plaintiff arrived the next day, Jordan Eslick, another manager in the store, held a meeting with Plaintiff and Mr. Simmons. During the meeting, Mr. Eslick told Plaintiff that

---

[10] Plaintiff was not diagnosed with cancer. Rather, she had an abnormal pap smear that required additional testing. Ex. 1, Pltf's depo. 169:20-170:2.

Mr. Simmons was doing his job correctly, and that Plaintiff was being overdramatic. Ex. 1, Pltf's depo. 118:8-19.

102. Mr. Eslick and Mr. Simmons further told Plaintiff that Mr. Simmons was just trying to help Plaintiff do her job better. Ex. 1, Pltf's depo. 119:15-20.

103. Plaintiff stated she was not feeling comfortable because it seemed like Mr. Simmons pointed out her mistakes to be mean, and she was going home crying every day. Ex. 1, Pltf's depo. 119:20-24.

104. Plaintiff estimates the meeting took approximately ten minutes, and she agrees that, based on her notes, that meeting occurred on April 30, 2018. Ex. 1, Pltf's depo. 120:4-7, 215:10-216:14.

105. Later, Plaintiff saw Mr. Sesker in the store, and Mr. Sesker asked Plaintiff why she had not come in early for their meeting. Plaintiff told him she had the meeting with Mr. Eslick and Mr. Simmons. Mr. Sesker seemed upset about this. He said he was sorry, that was not how he wanted things to go, and he planned to talk to Mr. Eslick about it. Ex. 1, Pltf's depo. 118:20-119:1.

106. Plaintiff did not have any further conversation with Mr. Sesker about Mr. Simmons. Ex. 1, Pltf's depo. 119:2-4.

107. The notes Plaintiff produced in this case have a second page, which she allegedly also took on April 30, 2018. *See* Ex 21, CANNADY 58. Hy-Vee's counsel viewed the original notebook and learned that this page is not connected to the notebook. In any event, the note says:

> Mitch has been treating me different ever since I turned him down. He asked me if I hooked up with all my boss's [sic] and I told him "no." And he then asked "Are you sure?" and I said "Yes I'm sure." Not even sure why he thought I did in the first place other than he thinks Mike Moore has the hots for me. Up until that day he had been nice to me and really wanting me to succeed in the program, even asked me to stay and be his assistant but clearly it was for a reason which makes since [sic] since he asked me to come have drinks with him since he was "gonna be alone" because his wife was out of

town. Of course I just laughed and said that I wouldn't. Trying not to make
things awkward.

Ex. 21, Pltf's notes.

108.     Plaintiff's notes on May 3, 2018 state that she came in on her day off to help an

employee named Trey because Mr. Simmons gave Trey too much to do, and Trey begged Plaintiff

to help him. Ex. 21, Pltf's notes.

109.     On May 4, 2018, Plaintiff's notes indicate that she had a good day. Mr. Simmons

was in "an okay mood." He complained about Mr. Sesker being in the department too much and

controlling him. The notes further state that Mr. Simmons left early and made Plaintiff finish

donuts alone and that Plaintiff did a "pull down" on the aisles, which Mr. Simmons said not to do,

but Plaintiff did not believe Mr. Sesker made that decision. Ex. 21, Pltf's notes.

110.     In May 2018, Cale Suppes met with Mr. Sesker and Ms. Douthit to express

concerns about Mitch Simmons' behavior. He indicated things had been going downhill over the

last month. He complained that Mr. Simmons never said "thank you," sets people up for failure,

and gives lists that are impossible to complete. He reported that everyone wanted out of the Bakery.

Ex. 27, Sesker notes; Ex. 7, Sesker Decl. ¶ 11; Ex. 4, Douthit Decl. ¶ 17.

111.     Mr. Suppes further stated that Mr. Simmons only cares about himself. He stated

Mr. Simmons beats Ms. Cannady down, swears at Mr. Suppes and others, and throws things when

he's mad while saying things under his breath. Ex. 27, Sesker notes; Ex. 28, Douthit notes; Ex. 4,

Douthit Decl. ¶ 18.

112.     Plaintiff's notes on May 10, 2018 state that Mr. Simmons was mad all day and

talked about wanting to kill Jordan Eslick "so slow so he could watch him die and get a high off

of it because he hated him so much." Plaintiff laughed because she thought he was joking, but Mr.

Simmons said he was serious. Ex. 21, Pltf's notes; Ex. 1, Pltf's depo. 175:25-176:21.

113.    Plaintiff's notes from May 10, 2018 further state that Linda Green (a full time cake decorator) threatened to go down to part time and Karen (Hocek) said she was going to start looking for a new job if Mr. Simmons "didn't stop his shit." Mr. Simmons and Ms. Green spoke for a long time. "Linda was not happy at all. Linda was gonna go to Jeff about him but I think Mitch said he was sorry and she got over it." Ex. 21, Pltf's notes; Ex. 1, Pltf's depo. 175:25-176:21.

114.    Plaintiff's notes on May 11, 2018 state that Mr. Simmons let Plaintiff and Mr. Suppes switch schedules. He then had Plaintiff go to another store to get cake boxes. Mr. Simmons then told Mr. Suppes nothing got done because of Plaintiff but did not tell him she had gone to another store to get supplies. Ex. 21, Pltf's notes.

115.    On May 13, 2018, Plaintiff's notes state: "I messed up today and it was defiantly [sic] my fault." Plaintiff was two hours late. She was scared of what Jeff Sesker would think because she did not want him to think things would be the way they were when Plaintiff worked in the Kitchen. She wanted to show him she cares. "I understand why Mitch was mad as he had every right to be." Mr. Simmons was also upset because he wanted Plaintiff to stay longer but did not tell her than until she was leaving. Ex. 21, Pltf's notes.

116.    On May 14, 2018, Plaintiff informed Ms. Petrucci that she believed Mr. Simmons had asked Mr. Sesker to remove Plaintiff from the affiliate program. Plaintiff stated that if that happened, she would not want to work at the store anymore because she would be too embarrassed. Ex. 29, CANNADY 10.

117.    In reality, Mr. Simmons never asked Mr. Sesker to remove Plaintiff from the program. Ex. 9, Sesker depo. 28:10-13.

118.    In addition, Mr. Sesker never talked to Plaintiff about coming out of the program, nor did Plaintiff ever actually come out of the program (until she resigned). Ex. 1, Pltf's depo.

184:5-24.

119.    In mid-May 2018, Plaintiff met with Ms. Douthit and told her she was going to look for another job. Ms. Douthit apologized and said there was nothing she could do. It was out of her hands. Ex. 1, Pltf's depo. 106:17-107:22.

120.    Plaintiff's notes on May 16, 2018 state that it was Mr. Simmons' last day before he left to get married, and he did not bother her that day. She realized he had messed up the schedule for the following week and had Ms. Petrucci sign off on changes. "Other than that it was a good day." Ex. 21, Pltf's notes.

121.    On May 17, 2018, Plaintiff sprained her ankle. Ex. 21, Pltf's notes.

122.    On May 21, 2018, Plaintiff sent a text message to Ms. Petrucci stating she was not sure why but she worked better when Mr. Simmons was not around. Plaintiff further stated: "I just hope our talk with Jeff goes good and he doesn't take it as me going behind his back or wanting him to be in trouble I just want a good relationship with him bcuz I feel that's really important **and I'm not sure where or when it got lost.**" Ex. 30, CANNADY 11 (emphasis added).[11]

123.    On that same day, Plaintiff sent Ms. Petrucci another text discussing her opinion that if Mr. Suppes decides to leave, he should give two weeks' notice because "as much as he think[s] it would be a slap for Mitch we would all feel the rage from him and it would make our jobs 10x harder." Ex. 31, CANNADY 13.

124.    On the same day (May 21, 2018), Karen Hocek, a cake decorator, quit without notice because she was mad at Mr. Simmons. Plaintiff stated she was not surprised because the day before Mr. Simmons left for vacation, Ms. Hocek was "beyond mad." Plaintiff "had never

---

[11] It appears that Ms. Petrucci sent Plaintiff a text with advice about what to say to Mr. Sesker, but the text is not complete and is not dated. Because Plaintiff did not preserve her text messages, that evidence has now been destroyed. Ex. 33, CANNADY 17. Plaintiff agrees there is likely a missing message. Ex. 1, Pltf's depo. 185:18-23.

seen her so mad" in her life. Ex. 32, CANNADY 16; Ex. 1, Pltf's depo. 185:8-17.

125.    Ms. Hocek told Plaintiff she had had enough of Mr. Simmons and was tired of the bullshit. Ex. 21, Pltf's notes at CANNADY 86; Ex. 1, Pltf's depo. 180:14-24, 250:2-9. Plaintiff did not witness Mr. Simmons do anything inappropriate to Ms. Hocek. *Id*. at 250:10-12.

126.    Plaintiff ended up talking to Mr. Simmons about her concerns, rather than going to Mr. Sesker. In that conversation, Plaintiff explained how she felt, and Mr. Simmons said he would work on helping her more. Ex. 1, Pltf's depo. 186:14-187:10.

127.    Plaintiff's notes on May 23, 2018 indicate she was upset with Mr. Suppes because he did not complete the tasks he was supposed to complete. The notes also state that Plaintiff "got offered a really good job today," and would consider it but wanted to see if Mr. Simmons changed when he returned. "If he does not change then I will put in my 2 weeks." Ex. 21, Pltf's notes.

128.    In this same timeframe, Plaintiff claims Mr. Simmons asked her to move 50-pound bags from one location to another for no apparent purpose. Doug McKee ended up helping her move them. Ex. 1, Pltf's depo.173:4-11; 246:14-247:1.

129.    This incident is not recorded in Plaintiff's notes. Ex. 21, Pltf's notes.

130.    On May 25, 2018, Mr. Simmons sent Plaintiff home because she was on pain medication and could not operate the equipment. Ex. 21, Pltf's notes. On that same day, Plaintiff's notes indicate that Mr. Simmons criticized Plaintiff's cookie display even though she had done it the way he had told her to. Ex. 21, Pltf's notes.

131.    On May 26, 2018, Mr. Simmons told Plaintiff she could not operate machines. "He had me wrapping out all morning which I was fine with and totally understood. He thought I was mad at him but I was not." After her break, Mr. Simmons asked Plaintiff if she had taken her pain medication. Plaintiff told him she had not because he made her feel like she was an inconvenience

to the department when she was on them. Mr. Simmons then left Plaintiff there to cut donuts and make Italian bread, even though Mr. Sesker and Ms. Douthit had told her not to use those machines. So Plaintiff had someone else do the donut cutting, and she left and came back to make the Italian dough later. Ex. 21, Pltf's notes.

132.    On that same day (May 26, 2018), Plaintiff also learned that Jamie Stewart had resigned. Ex. 21, Pltf's notes at CANNADY 90. Ms. Stewart indicated she was leaving because she was being mistreated. Ex. 1, Pltf's depo. 247:7-248:16. Plaintiff never saw Mr. Simmons do anything inappropriate to Ms. Stewart. *Id.* at 249:3-5.

133.    On May 28, 2018,[12] Plaintiff sent a text message to Ms. Petrucci indicating she was resigning to take a position at Salvatore's. Plaintiff stated that Salvatore's had been trying to get her to be the catering manager and back of the house manager for a long time but could not give her the hours she needed until recently. "She's going to pay me what I make now plus commission Plus all the gratuity from each catering I do plus bonuses in a 401k and paid vacation and insurance and I just know with mitch I'll never be happy, he's gonna just get worse and I can't do it anymore." Ex. 34, CANNADY 20.

134.    On May 29, 2018, Plaintiff provided a letter of resignation to Aimee Douthit (addressed to Jeff Sesker). Ex. 1, Pltf's depo. 193:25-195:11. The letter states:

> Please accept this as my formal letter of resignation from my position at Hy-Vee. My last day will be June 19, 2018. This was not an easy decision, but I hope you can understand.
>
> I cannot express how much I truly appreciate everything this store has done for me. I have learned so much and you have been so good to me. I will miss you all very

---

[12] Plaintiff testified that she contacted Mr. Garozzo (again) in early June 2018. Ex. 1, Pltf's depo. 32:7-17. Plaintiff told Mr. Garozzo she was ready to come to work for him, and he said she could start whenever she wanted. Ex. 1, Pltf's depo. 32:8-33:2. Plaintiff told him she was going to put in her two weeks first and then would start there on June 19, 2018. Ex. 1, Pltf's depo. 32:25-33:4. Mr. Garozzo told Plaintiff he would pay her what she was getting paid at Hy-Vee. 33:8-13. Based on Plaintiff's notes and the timing of her resignation, this conversation must have happened in May 2018.

much. This will be one of the hardest things that I will have to do.

Please let me kwon if there is anything at all that I can do to help with the transition. I would be more than willing to help train an incoming employee if needed. It has been a true honor to work for you. Thank you for all the opportunities I have been offered, it has been a wonderful 7 years with this company and I wish you and everyone here at Hy-Vee the very best.

Ex. 35, Pltf's Resignation Letter (Depo. Ex. 49).

135. Sometime after she submitted her resignation, but before she left the store, Plaintiff claims she provided her notes to Aimee Douthit. Ex. 1, Pltf's depo. 162:14-163:1.

136. Plaintiff told Ms. Douthit the notebook contained notes she had taken down about her "day-to-day basis" and how things were going in the Bakery. Ex. 1, Pltf's depo. 161:7-12.

137. Mr. Simmons was not aware Plaintiff had taken any notes asserting that he mistreated her because she rejected his advances, and did not know she had provided any notes to Ms. Douthit or anyone else. Ex. 16, Simmons Decl. ¶ 9.[13]

138. On June 4, 2018, Plaintiff sent Ms. Petrucci a text message stating she wished she could stay, but she knows Mr. Simmons will not change "now that he has cale. He told cale that he was the backbone to the whole bakery and that's why Allen couldn't hold his tongue anymore, it pissed him off and I don't blame him." Ex. 36, CANNADY 22.

139. Ms. Petrucci responded that Cale was the backbone "because he'll do everything [Mitch] doesn't want to." Ex. 37, CANNADY 23.

140. Plaintiff responded as follows: "Well, I hope he doesn't push cale to his limits bcuz he's came close many times …" Ex. 37, CANNADY 23.

141. On June 11, 2018, Cale Suppes walked out because he was upset with the way Mr.

---

[13] Ms. Douthit also did not review the notebook. Ms. Douthit recalls that Plaintiff simply asked her to keep her notebook for her because it contained information about the management program Plaintiff had participated in. Ex. 4, Douthit Decl. ¶ 24.

Simmons treated him. Ex. 38, CANNADY 26.

142.    Plaintiff informed Ms. Petrucci that Cale had texted her and said he had a meeting the next day with Jeff Sesker and Aimee Douthit. Ex. 38, CANNADY 26.

143.    Plaintiff did not produce that text message and testified she no longer has the ability to obtain text messages she failed to preserve. Ex. 1, Pltf's depo. 197:17-198:14.

144.    Regardless, Ms. Petrucci responded with a text that states: "Unfortunately for Alan, Brigitte, Cale, I think they all just hit their limits. Just a build up of stuff and then one more thing and BOOM! Volcano erupts!!!" Ex. 39, CANNADY 27.

145.    Plaintiff responded by stating: "Ya that's what I told Alan. I said I don't think it's that situation that set him off, bcuz cale came in heated and ready to walk out already at 4am lol the new guy who started yesterday said he only worked with mitxch [sic] for about an hour and wants to already get transferred !!" Ex. 39, CANNADY 27.

146.    Plaintiff admits that, like her, Cale Suppes had many complaints about Mitch Simmons. Ex. 1, Pltf's depo. 156:16-25.

147.    In fact, Mr. Suppes made at least two additional complaints about Mr. Simmons after Plaintiff turned in her resignation – one in June 2018 and one in August 2018. Ex. 40, Douthit notes; Ex. 4, Douthit Decl. ¶ 17; Ex. 41, Sesker Notes; Ex. 7, Sesker Decl. ¶ 12.

148.    Near the end of Plaintiff's time in the Bakery, she witnessed Mr. Simmons and Alan Jordan have an argument. Mr. Jordan was mad. They moved into the hall and then went to discuss the problem with a manager in the office. Ex. 1, Pltf's depo. 148:19-149:7.

149.    Alan Jordan also made a complaint about Mr. Simmons in December 2018, indicating he did not believe Mr. Simmons treated him with respect and that Mr. Simmons only cared about himself. Ex. 42, Douthit Notes; Ex. 8, Douthit depo. 43:3-23; Ex. 4, Douthit Decl. ¶

23; Ex. 43, Sesker Notes; Ex. 7, Sesker Decl. ¶ 13.

150.    Like Plaintiff, both Alan Jordan and Cale Suppes testified that Mr. Simmons also yelled at them. Ex. 44, Jordan depo. 14:25-15:2; Ex. 5, Suppes depo. 22:15-17.

151.    Mr. Simmons also had several verbal altercations with Linda Green. Ex. 5, Suppes depo. 33:9-20. They disagreed about how things should be done and butted heads about it. *Id.*

152.    Mr. Jordan indicated that Mr. Simmons had an uphill battle when he began as manager because people do not like change. *Id*. at 7:13-8:6, 18:5-14.

153.    When asked to describe Mr. Simmons at his deposition on September 15, 2020, Mr. Jordan's response was, "Now or when I first met him?" Ex. 44, Jordan depo. 7:13-14.

154.    Similarly, Mr. Suppes testified that things did not go smoothly when Mr. Simmons took over as Bakery Manager, and Mr. Suppes made numerous complaints to Mr. Sesker and Ms. Douthit about him. *Id*. at 65:17-66:9.

155.    Since then, Mr. Simmons' behavior has improved. Ex. 5, Suppes depo. 66:10-20. Mr. Simmons now works harder than Mr. Suppes, which is different than when he first started. Ex. 5, Suppes depo. 44:12-15.

156.    Mr. Suppes' relationship with Mr. Simmons improved after Mr. Suppes got a handle on baking, and Mr. Simmons no longer had to teach Mr. Suppes. Ex. 5, Suppes depo. 66:10-20.

157.    Bridget Kavanagh also made a complaint about Mr. Simmons in June 2018. Ms. Kavanaugh indicated Mr. Simmons gave her lists that were unrealistic and did not show respect to his employees. Ms. Kavanaugh indicated she did not enjoy her work anymore. Ex. 45, HV 00596; Ex. 8, Douthit depo. 41:19-42:1, 43:4-44:6; Ex. 4, Douthit Decl. ¶¶ 20-21.

158.    Ms. Kavanaugh transferred to a different department shortly thereafter. Ex. 4,

Douthit Decl. ¶ 23.

159. Plaintiff testified to her belief that 14 women left that Bakery due to Mr. Simmons' "harassment." Ex. 1, Pltf's depo. 247:7-17.

160. Plaintiff continued working in the Bakery until June 18, 2018. Ex. 1, Pltf's depo. 199:14-18.

161. Plaintiff began working at Salvatore's on June 19, 2018. Ex. 1, Pltf's depo. 200:8-11. She also continued to work at Hy-Vee but in the Salad Bar one day per week (on Sundays). Ex. 1, Pltf's depo. 199:19-200:3.

162. On September 9, 2018, Plaintiff came in to work at Hy-Vee and informed Hy-Vee that would be her last day. Ex. 1, Pltf's depo. 200:19-201:1.

163. Plaintiff's decision to stop working part-time in the Salad Bar was related to something that happened outside of work and had nothing to do with Hy-Vee. Ex. 1, Pltf's depo. 213:4-214:2.

**F.     Alleged Sexual Harassment.**

164. Plaintiff does not claim that anyone other than Mitch Simmons sexually harassed her, and she does not claim anyone other than Mitch Simmons treated her differently due to her gender. Ex. 1, Pltf's depo. 81:23-82:1.

165. Plaintiff does not claim that Mr. Simmons sexually harassed her before January 2018. Ex. 1, Pltf's depo. 81:2-6.

166. In fact, Plaintiff testified that Mr. Simmons treated her better than most employees for the first part of her employment in the Bakery. Ex. 1, Pltf's depo. 304:5-9.

167. Plaintiff testified that Mitch Simmons sexually harassed her by asking her to have drinks on two occasions (as discussed above), by asking her if she hooked up with all of her bosses (as discussed above), and by nitpicking her work (as discussed above). Ex. 1, Pltf's depo. 254:11-

14.

168.	Plaintiff could not think of any other ways Mr. Simmons sexually harassed her. Ex. 1, Pltf's depo. 112:23-25.

169.	Although Plaintiff did not recall it in her deposition, Amy Harris testified that she witnessed Mr. Simmons pulling Plaintiff's chair closer to him when Plaintiff and Mr. Simmons were doing some kind of webinar in an office where Ms. Harris was also taking a webinar. Plaintiff scooted away, and Mr. Simmons pulled her chair closer again. At that point, another employee walked in and said, "Well, Goddamn, why don't you all just share a chair?" Mr. Simmons' responded, "I wouldn't mind." Ex. 46, Excerpts from Amy Harris's deposition ("Harris depo.") 27:9-22.

170.	According to Ms. Harris, this incident occurred within the first month Plaintiff was in the Bakery. Ex. 46, Harris depo. 30:24-31:5.

171.	Plaintiff heard Mr. Simmons make comments about customers, such as commenting on their bodies on a daily basis. She also heard him make comments to Mr. Suppes about his sex life with his wife. Ex. 1, Pltf's depo. 113:1-17.

172.	She claims she heard Mr. Simmons say that a 16-year-old employee was the finest piece of 16-year-old ass he had seen. Ex. 1, Pltf's depo. 113:18-25, 115:10-13.

173.	That is the only sexual comment Plaintiff heard Mr. Simmons make about a co-worker. Ex. 1, Pltf's depo. 311:24-312:6.

174.	Plaintiff could not think of any other inappropriate comments she heard Mr. Simmons make. Ex. 1, Pltf's depo.114:1-2; 255:6-25, 263:3-6.

175.	Plaintiff complained about Mr. Simmons' behavior to Ms. Douthit on three

occasions, each described above. Ex. 1, Pltf's depo. 116:7-15, 121:4-6.[14] She complained to Mr. Sesker about him on one occasion, also described above. *Id.* at 116:16-119:4, 121:7-8.

176.     Plaintiff did not raise any concerns about sexual harassment or gender discrimination in those conversations. Ex. 1, Pltf's depo. 121:4-13.

177.     According to Plaintiff, the reason she did not raise those concerns is that she knew nothing would happen because Mr. Simmons' dad (she believed) held a high position within corporate Hy-Vee. Ex. 1, Pltf's depo. 100:23-101:24.

178.     Mr. Simmons' dad does not work at corporate. He is a Store Director in Columbia, Missouri. Ex. 4, Douthit Decl. ¶ 26.

**G.     Alleged Retaliation.**

179.     Plaintiff claims Mr. Simmons treated her badly after she told him she did not hook up with all her bosses. Ex. 1, Pltf's depo. 259:2-16.

180.     Mr. Simmons' negative treatment is all included above. Ex. 1, Pltf's depo. 259:2-260:16, 109:14-15.

**H.     Plaintiff's Spoliation of Evidence.**

181.     Plaintiff filed her charge of discrimination on October 17, 2018. Ex. 1, Pltf's depo. 237:7-13.

182.     In that same timeframe, Plaintiff took screen shots of certain text messages which she later produced in this case. Ex. 1, Pltf's depo. 122:1-16, 280:6-21.

183.     The screen shots of text messages Plaintiff produced date back to August 2017. *See, e.g.*, Ex. 47 at CANNADY 46.

---

[14] Ms. Douthit recalls Plaintiff speaking to her many times throughout her employment – in both the Kitchen and the Bakery, but the concerns Plaintiff raised were relatively minor, such as scheduling issues, that Mr. Simmons was upset because she had messed up dough, and things like that. Ex. 8, Douthit depo. 48:15-17, 53:17-22, 55:12-21, 57:25-58:6, 97:1-98:6.

184. At the time she did that, she still had the same physical phone that she had in early 2018. Ex. 1, Pltf's depo. 279:19-280:21.

185. The screen shots Plaintiff took and produced often do not contain the full text message and often do not include the text messages before or after the message Plaintiff retained. *See, e.g.*, Ex. 47.

186. As an example, at CANNADY 4, Plaintiff produced a text message that states: "You missed the good stuff! Jeff called Mitch into the office and then me and then cale mostly …" The text message then cuts off. We now do not know what the rest of the text message says, nor can we tell the date Plaintiff sent it. Ex. 1, Pltf's depo. 143:14-144:3; Ex. 15.

187. Similarly, Plaintiff produced a portion of a text message to Cale Suppes where she discusses this case, but the text message is cut off, and Plaintiff did not preserve the text message. Ex. 48, CANNADY 188, Ex. 1, Pltf's depo. 232:13-234:16.

188. Mr. Suppes has indicated that Plaintiff offered to give him part of her settlement if he helped her. Ex. 49, Suppes Decl. ¶ 4. But Plaintiff no longer has any additional text messages with Mr. Suppes. They are conveniently destroyed. *See supra.*

189. Plaintiff no longer has the phone she had during the time she worked for Hy-Vee. She traded it in for another phone in October 2019.[15] Ex. 1, Pltf's depo. 13:4-14:1.

190. Plaintiff did not do anything to retain other text messages and is not aware of any way to access those now. Ex. 1, Pltf's depo. 122:17-123:11.

191. As a result, many relevant text messages are cut off or missing altogether, and Plaintiff no longer has the ability to produce them. Ex. 1, Pltf's depo. 126:5-8, 127:4-128:2, 143:1-

---

[15] Notably, Hy-Vee first served Plaintiff discovery requests in this case on September 10, 2019, and Plaintiff responded on October 17, 2019. Hy-Vee's Request for Production sought, among other things, her text messages and audio recordings. *See* Ex. 50.

3, 143:24-144:3, 145:38-15, 197:7-11.

192.    During her employment, Plaintiff and Mitch Simmons had frequent text messages. Ex. 1, Pltf's depo. 41:16-18; Ex. 24, portions of Pltf's phone records[16]; Ex. 16, Simmons Decl. ¶ 12.[17]

193.    Plaintiff did not retain any of those text message. Ex. 1, Pltf's depo. 123:4-11.

194.    Plaintiff also had frequent text messages with Cale Suppes and Anna Cook. Ex. 24, portions of Pltf's phone records. Plaintiff did not produce any text messages with Anna Cook and only produced 12 text messages with Mr. Suppes.

195.    In 2014, Plaintiff installed an app on her phone called "Call Recorder." Ex. 1, Pltf's depo. 277:19-279:5.

196.    The app records all of Plaintiff's phone calls. Ex. 1, Pltf's depo. 277:19-278:13.

197.    The conversations are accessible from her phone, but when she switched phones, she lost access to the conversations she had on her previous phone. Ex. 1, Pltf's depo. 279:6-12.

198.    Plaintiff did not preserve the recordings of the phone conversations she had with Mitch Simmons, which she now claims are part of the sexual harassment. Ex. 1, Pltf's depo. 279:6-281:1.

## I.    Other Miscellaneous Facts.

199.    Mr. Simmons occasionally has beers with employees in his department, including Cale Suppes. Ex. 5, Suppes depo. 37:2-4.

200.    Plaintiff cried at work fairly frequently, both when she worked in the Kitchen and

---

[16] The phone records Plaintiff produced in this case have more than 54,000 lines of data. For ease of reference, Hy-Vee has attached portions of those notes, sorted by sender/recipient, but Hy-Vee is happy to provide the Court with a complete copy of the records if the Court would like to have them.

[17] Plaintiff does not claim Mr. Simmons ever said anything inappropriate on any text messages. Ex. 1, Pltf's depo. 41:16-23.

when she worked in the Bakery. Ex. 8, Douthit depo. 101:25-102:8; Ex. 1, Pltf's depo. 276:4-16.

201.    Plaintiff received no discipline when she worked in the Bakery. Ex. 4, Douthit Decl. ¶ 5.

202.    At some point after her employment with Hy-Vee ended, Plaintiff became aware that Amy Mari (Harris) and Jinnifer (Jenny) Hampton reported alleged harassment or discrimination at Hy-Vee, but Plaintiff was not aware of either complaint or that anyone else complained about alleged harassment or discrimination while Plaintiff was employed. Ex. 1, Pltf's depo. 264:11-268:11; Ex. 51, Excerpts from Jinnifer Hampton's deposition ("Hampton depo.") 75:2-13; Ex. 46, Harris depo. 140:6-9.

## II.  ARGUMENT

### A.  SUMMARY JUDGMENT STANDARD.

The standards for summary judgment are well-settled. Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986).  Summary judgment is not a disfavored procedural shortcut, but is instead "a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (citation omitted).

A party opposing summary judgment may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995). "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). Likewise, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir. 2007); *Calvin v. City of Laurie*, No. 2:11-CV-04124, 2012 U.S. Dist. LEXIS 164800, at *23 (W.D. Mo. Nov. 19, 2012).

### B.  HY-VEE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SEXUAL HARASSMENT CLAIM.

Under the MHRA, there are two forms of sexual harassment claims: sexually hostile work environment and *quid pro quo*. As set forth below, Plaintiff cannot prevail on her sexual harassment claim under either form.

### 1. Plaintiff cannot prove hostile work environment sexual harassment.

To prevail on a claim for hostile work environment sexual harassment under the MHRA, Plaintiff must have evidence to prove, among other things: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) her gender was a contributing factor in the harassment; and (4) a term, condition, or privilege of her employment was affected by the harassment. *See Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856, 861 (8th Cir. 2015) (analyzing MHRA claim) (quoting *Hill v. City of St. Louis*, 371 S.W.3d 66, 70 (Mo. App. 2012)).

The standard for demonstrating a hostile work environment is "demanding." *LeGrand v. Area Res. For Cnty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005) (analyzing sexual harassment claim under the MHRA and Title VII). Plaintiff can establish a hostile work environment only if she can prove "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal citations omitted). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Hoaglin v. Hy-Vee Inc.*, No. 6:18-03262-CV-RK, 2019 U.S. Dist. LEXIS 77607, *10 (W.D. Mo. May 8, 2019) (interpreting MHRA hostile work environment claim) (quoting *LeGrand v. Area Res. For Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005)).

Plaintiff cannot meet this demanding standard because the vast majority of the "harassment" Plaintiff alleges was aimed at men and women alike. The remaining conduct does not even approach that necessary to establish a hostile work environment under relevant precedent. For these reasons, Hy-Vee is entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

### a. Even assuming the truth of Plaintiff's testimony, the vast majority of Mr. Simmons' alleged conduct was not gender-based.

"An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other." *Duncan v. GMC*, 300 F.3d 928, 933 (8th Cir. 2002). "The fundamental issue is whether members of one sex are subjected to unfavorable conditions of employment that the members of the opposite sex are not." *Id.* "A dually offensive sexual atmosphere in the workplace, no matter how offensive, is not unlawful discrimination unless one gender is treated differently than the other." *Ellett v. Big Red Keno, Inc.*, Nos. 98-3046, 98-3694, 2000 U.S. App. LEXIS 17583, *2-3 (8th Cir. July 21, 2000) (unpublished) (affirming summary judgment on sexual harassment claim because all employees were subject to the same offensive workplace atmosphere); *Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 908 (8th Cir. 2010) (affirming dismissal of the plaintiff's MHRA harassment claim because there was no evidence to show the alleged harasser was hostile towards the plaintiff because of her protected class).

Assuming the truth of Plaintiff's testimony, Mr. Simmons criticized her about how she set up the displays of bakery items, how she managed employees, how she made dough, and how she cleaned. SOF 64, 65. Mr. Simmons talked to her like she was stupid and pointed out her mistakes. SOF 66. She also claims Mr. Simmons sent her home from work one day because she was on medication due to her sprained ankle. SOF 130. These allegations are not even remotely sexual in nature, and thus cannot constitute unlawful sexual harassment under the MHRA. *See Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159-60 (8th Cir. 1999) (employee's feeling of being unfairly criticized and being yelled at was "not desirable" but not actionable harassment).

Beyond that, the undisputed facts illustrate Mr. Simmons treated male employees in exactly the same fashion as he treated female employees. Specifically:

- Mr. Simmons became upset with Mr. Blanton because he did not cut the donuts

even though it was Mr. Simmons who did not schedule enough help to allow Mr. Blanton to do that. SOF 21.

- Jeremy Blanton and Rick Whyle quit within a few months of Mr. Simmons becoming Bakery Manager because they butted heads with Mr. Simmons. SOF 18.

- In August 2017, Cale Suppes indicated he was going to look for another job if Mr. Simmons did not train them better. SOF 22.

- Mr. Simmons yelled at Alan Jordan and Cale Suppes. SOF 150.

- On March 18, 2018, Plaintiff's notes indicate Mr. Simmons was "a complete dick to me **and everyone else**" that day. SOF 70. On that same day, Plaintiff texted Ms. Petrucci that Mr. Simmons did not say "good morning" to anyone and had a reputation for being a dick to people. SOF 73.

- On March 30, 2018, Plaintiff's notes indicate she was tired of Mr. Simmons "bringing me **and other people** down. He never talks to me **or anyone** with respect. SOF 81.

- On May 3, 2018, an employee named Trey asked Plaintiff to come in on her day off because Mr. Simmons had given him too much to do. SOF 108.

- In May 2018, Mr. Suppes lodged a complaint about Mr. Simmons, noting Mr. Simmons never said "thank you," sets people up for failure, and gave lists that were impossible to complete. SOF 110.

- Mr. Suppes reported that **everyone** wanted out of the Bakery. SOF 110. He further reported that Mr. Simmons swore at him and others. SOF 111.

- As he did to Plaintiff, Mr. Simmons (in Plaintiff's words) "push[ed] Cale to his limits" many times. SOF 140.

- On June 11, 2018, Mr. Suppes walked out because he was upset with the way Mr. Simmons treated him.

- In that timeframe, Ms. Petrucci noted that Mr. Simmons had pushed Alan Jordan (male), Bridget Kavanaugh (female), and Cale Suppes (male) to their limits. "just a build up of stuff and then one more thing and BOOM! Volcano erupts!!!"

- Also, in that timeframe, a male employee started in the Bakery and in Plaintiff's words "only worked with mitxch [sic] for about an hour and wanted to already get transferred !!" SOF 145.

- In December 2018, Mr. Jordan complained about Mr. Simmons, stating he only cared about himself and did not treat Mr. Jordan with respect. SOF 149.

In short, Mr. Simmons treated Plaintiff no differently than the male employees. Indeed, in real time, Plaintiff recorded that "everyone" was subject to Mr. Simmons' attitude and behavior and Mr. Simmons "hated everyone and that's why he treats all of us so badly." SOF 76. *See Hesse v. Avis Rent A Car Sys.*, 394 F.3d 624, 630 (8th Cir. 2005) (affirming summary judgment where conduct was directed at both male and female employees). Moreover, Plaintiff testified Mr. Simmons initially treated her more favorably than the men. SOF 166.

Viewing the facts in the light most favorable to Plaintiff, the evidence here proves that Mr. Simmons was critical of *everyone* in the Bakery Department, irrespective of gender. Because Mr. Simmons' disrespectful and critical behavior was not gender-specific, those allegations cannot be included in analyzing whether Plaintiff has established a hostile work environment claim.

> **b.     The gender-specific conduct about which Plaintiff complains was not sufficiently severe or pervasive to affect a term, condition, or privilege of Plaintiff's employment.**

Harassment is only actionable under the MHRA "if it is ***sufficiently severe or pervasive*** enough to alter the conditions of a plaintiff's employment and create an ***abusive working environment***. . . .   The conduct must be sufficient to create a ***hostile work environment***, both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person." *Alhalabi v. Missouri Dep't of Nat. Res.*, 300 S.W.3d 518, 527 (Mo. Ct. App. 2009) (emphasis added) (internal citations omitted); *see also Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 244-45 (Mo. Ct. App. 2006) ("The conduct must be sufficient to create a hostile work environment, both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person."). Though conduct may be "boorish, vulgar and inappropriate," it does not necessarily constitute gender discrimination under the MHRA unless it was objectively and subjectively severe or pervasive. *Barekman*, 232 S.W. 3d at 681; *Schoffstall v. Henderson*,

223 F.3d 818, 826-27 (8th Cir. 2000)). The harassment must be "extreme and not merely rude of unpleasant." *Watson v. Heartland Health Labs., Inc.*, 2014 U.S. Dist. LEXIS 66078, at *12 (W.D. Mo. May 14, 2014) (analyzing MHRA claim); *see also Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999) ("More than a few isolated incidents are required," and the alleged harassment must be "so intimidating, offensive, or hostile that it poisoned the work environment.").

The gender-based conduct Plaintiff has identified boil down to a few, isolated incidents. Specifically, Plaintiff points to: (1) Mr. Simmons offering to buy her a drink in January 2018 after her nephew died; (2) Mr. Simmons asking if she hooked up with all of her bosses in March 2018; (3) Mr. Simmons offering to get drinks with her in late April 2018; (4) Mr. Simmons' commenting on customers' physical appearance; (5) Mr. Simmons pulling Plaintiff's chair over toward him and responding he would not mind when someone else joked that they should use the same chair;[18] and (6) Mr. Simmons saying a 16-year-old employee was the finest piece of 16-year-old ass he had seen. SOF 172.

Even taking her allegations as true, this conduct falls woefully short of that needed to state a claim for actionable harassment. Indeed, Plaintiff's allegations pale in comparison to the experiences of plaintiffs in other cases where courts rejected the conduct as insufficient to survive summary judgment.

For example, in *LeGrand v. Area Resource for Community and Human Services*, the Eighth Circuit affirmed summary judgment in favor of the employer on claims of sexual harassment under the MHRA (and Title VII). 394 F.3d 1098 (8th Cir. 2005). In that case, the plaintiff claimed she was harassed in the following ways over a 9-month period: being asked to watch pornographic

---

[18] Notably, Plaintiff testified very clearly that Mr. Simmons did not sexually harass her until January 2018. SOF 165. In fact, she testified that Mr. Simmons treated her better than the male employees until she rejected him. SOF 166. The chair incident occurred long before January 2018. SOF 170. And Plaintiff obviously was not concerned about Mr. Simmons' comments about customers, which, according to her, occurred daily, beginning long before January 2018.

videos and "jerk off with [the alleged harasser]," grabbing of the plaintiff's buttocks, reaching for the plaintiff's genitals, "briefly gripp[ing]" the plaintiff's thigh, and attempting to kiss the plaintiff. The Eighth Circuit concluded that those actions "ranged from crass to churlish and were manifestly inappropriate," but they "were not so severe or pervasive as to position [the plaintiff's] work environment. *Id.* at 1102. *See also Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975 (8th Cir. 2003) (granting summary judgment and concluding that conduct such as the alleged harasser calling the plaintiff's house, discussing intimate details of his personal life with her, discussing relationships with his wife and other women, touching her arm, saying he loved her, and other conduct was not sufficiently severe or pervasive); *Duncan*, 300 F.3d at 934-35 (affirming summary judgment in an MHRA case where the plaintiff alleged that her co-worker propositioned her for a relationship, touched her hand; requested the plaintiff to sketch the planter in his office that was shaped like a slouched man wearing a sombrero with a hole in the front of his pants allowing for a cactus, posted a "Man Hater's Club" poster, and requested the plaintiff "type the He-Man Women Haters beliefs").

In reaching its conclusion, the *Duncan* Court cited the following as examples of cases that have "rejected hostile work environment claims premised on facts equally or more egregious than the conduct at issue":

> *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 872, 874 (5th Cir. 1999) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, repeated touching of plaintiff's arm, and attempts to look down the plaintiff's dress were insufficient to support hostile work environment claim), *cert. denied*, 528 U.S. 963 (1999); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (holding conduct insufficient to support hostile work environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions), *cert denied*, 528 U.S. 988 (1999); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24, 826 (6th Cir. 1997)(reversing jury

verdict and holding behavior merely offensive and insufficient to support hostile environment claim when employee reached across plaintiff, stated "[n]othing I like more in the morning than sticky buns" while staring at her suggestively; suggested to plaintiff that parcel of land be named "Hootersville," "Titsville," or "Twin Peaks"; and asked "weren't you there Saturday night dancing on the tables?" while discussing property near a biker bar), *cert. denied*, 522 U.S. 865 (1997); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (holding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar) (cited with approval in *Cram v. Rogers*, 49 F.3d 466, 475 (8th Cir. 1996)).

300 F.3d 928, 934-35 (8th Cir. 2002).[19]

Mr. Simmons' gender-related behavior (assuming it occurred) was plainly unprofessional and ill-advised, but it comes nowhere near that necessary to establish an actionable claim of sexual harassment.

### 2. Plaintiff cannot prove *quid pro quo* sexual harassment because she did not suffer any adverse employment action.

To establish *quid pro quo* sexual harassment, Plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010) (citation omitted). There must be a showing that a "tangible employment action follows

---

[19] *See also EEOC v. CRST Van Expedited, Inc.,* 679 F.3d 657, 686 (8th Cir. 2012) (finding the alleged harassing conduct was not severe or pervasive where comments were made about the plaintiffs' personal hygiene, the alleged harassers boasted about past sexual exploits, sporadic remarks of sexual vulgarity were made, and there were highly offensive but isolated instances of propositioning for sex); *Linville v. Sears, Roebuck & Co.*, 335 F.3d 822, 823-24 (8th Cir. 2003) (finding harassment not based on sex where the harassers repeatedly grabbed their own crotches, made kissing gestures, and described oral sex towards the plaintiff); *Cross v. Prairie Meadows Racetrack and Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010) (finding conduct of the alleged harasser grabbing the plaintiff's hair and pulling her out of a valet shack, brushing the back of his hand across the plaintiff's breast, responding angrily when the plaintiff rebuffed his request they be "more than friends," and spreading a rumor the plaintiff had performed oral sex on the alleged harasser did not establish the work environment was so permeated with discriminatory conduct to alter a term, condition, or privilege of the plaintiff's employment).

from the employee's refusal to submit to a supervisor's sexual demands." *Hoaglin v. Hy-Vee, Inc.*, No. 6:18-03262-CV-RK, 2019 U.S. Dist. LEXIS 77607, *10 (W.D. Mo. May 8, 2019) (quoting *Henthron v. Capital Commc'ns, Inc.*, 359 F.3d 1021, 1026-27 (8th Cir. 2004)).

Here, once Plaintiff moved to the Bakery, Hy-Vee took no action against her whatsoever. Plaintiff received no disciplinary action in the Bakery, and she resigned her position there, expressing her thanks for all the store had done for her and stating her 7 years at the store had been wonderful. SOF 134. *See Knowles v. Citicorp Mortg., Inc.*, 142 F.3d 1082, 1086 (8th Cir. 1998) (rejecting constructive discharge claim, in part, because the plaintiff submitted a resignation letter that did not raise any of his allegedly true reasons for leaving). Despite this resignation letter, the only conceivable tangible employment action Plaintiff could possibly assert is constructive discharge, and the undisputed facts do not even come close to supporting that claim.

To establish constructive discharge, Plaintiff must show: (1) a reasonable person in her situation would find the working conditions intolerable; and (2) Hy-Vee intended to force her to quit or could reasonably foresee its action would cause her to quit. *Cosby*, 804 F.3d at 1246 (citation omitted). *See also Mills v. St. Louis Cnt'y Gov't*, No. 4:17-CV-0257-PLC, 2018 WL 3208581, at *4 n.8 (E.D. Mo. June 29, 2018). Moreover, general inappropriate behavior is insufficient to establish constructive discharge. Rather, the alleged behavior must have some connection to a protected characteristic. *Alagna*, 324 F.3d at 980-81. *See also Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 960 (8th Cir. 2005) (same); *Duncan*, 300 F.3d at 935-36 (There must be "considerably more proof than an unpleasant and unprofessional environment"); *DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 501 (Mo. Ct. App. 2013).

In this context, that means Plaintiff must establish that Mr. Simmons engaged in behavior that forced her to resign because she indicated that she did not hook up with all her bosses. Plaintiff

is unable to do this for two reasons. First, the behavior she alleges – even assuming it occurred – does not rise to the level that would give a reasonable person no choice but to resign. *See, e.g.*, *Alagna*, 324 F.3d 975 (affirming summary judgment on constructive discharge claim where the plaintiff, whose co-worker told her he loved her, sent her gifts, called her at home more than 20 times, touched her arm, and ended conversations by moving closer to her and looking her up and down, was not subject to intolerable work conditions); *Philips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998) (affirming summary judgment on constructive discharge claim where the plaintiff was dissatisfied with her work assignments and her supervisor spoke to her in "nasty" voice); *Breeding*, 164 F.3d at 1160 (affirming summary judgment on constructive discharge claim and noting that "a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.").

Second, and perhaps more obvious, the undisputed facts illustrate that Mr. Simmons' behavior had nothing to do with Plaintiff's alleged rejection of his advances. To the contrary, Mr. Simmons directed his behavior at virtually all of the employees in the Bakery, not just Plaintiff, and Mr. Simmons' directed this behavior at Plaintiff both before and after she allegedly rejected his advances.

Specifically, the list of behavior included in Section A illustrates that Mr. Simmons treated men and women in the same fashion. For purposes of this analysis, Mr. Simmons' treatment of women who did not reject his advances is also important. In other words, Plaintiff cannot show that she was treated any differently than the women who did not reject Mr. Simmons' advances. Rather, the facts illustrate he treated them in a similar fashion. Specifically:

- Nothing in the record indicates Mr. Simmons made any advances toward Anna Cook, yet Ms. Cook's complaints about Mr. Simmons were nearly identical to the complaints Plaintiff now raises about him. Ms. Cook complained that Mr. Simmons was demeaning, condescending, yelled at her in front of customers, and made her

feel stupid when she asked questions. SOF 49. She stated he was verbally abusive, belittling, and set them up for failure. She stated she thought she was working in a hostile work environment. SOF 51.

- In January 2018, Dawanda Smith left the Bakery because she was being pushed too hard to learn so much in a short amount of time. SOF 35.

- On May 10, 2018, Plaintiff's notes indicate that long-time cake decorator threatened to go down to part time, and Karen Hocek said she was going to start looking for a new job if Mr. Simmons "didn't stop his shit." SOF 113.

- On May 21, 2018, Ms. Hocek quit without notice because she was mad at Mr. Simmons. SOF 124.

- On May 26, 2018, Jamie Stewart resigned due to Mr. Simmons' "harassment" and mistreatment. SOF 132.

- In June 2018, Bridget Kavanaugh complained to upper management that Mr. Simmons gave her unrealistic lists and did not show respect to his employees. Ms. Kavanaugh transferred out of the department shortly thereafter. SOF 157, 158.

In short, there is no indication that Mr. Simmons made advances toward Ms. Cook, Ms. Smith, Ms. Green, Ms. Hocek, Ms. Stewart, or Ms. Kavanaugh, yet Mr. Simmons treated all of them in the same way he treated Plaintiff, and many of them resigned or changed departments because of Mr. Simmons. In fact, Plaintiff claims 14 women left the department because of Mr. Simmons. SOF 159.

Moreover, Plaintiff's complaints about Mr. Simmons began long before Plaintiff allegedly rejected his advances. Specifically:

- On August 6, 2017, Plaintiff sent a text message to Ms. Petrucci stating that Mr. Simmons made her feel stupid "once again" by telling her she was the reason the donuts looked bad. SOF 23.

- On the same night, she expressed her frustration that they could not complete the donuts without working more than they were allowed. "So we are supposed to leave our messes and expect not to get yelled at?" SOF 24.

- On August 10, 2017, Plaintiff exchanged text messages with Mr. Suppes and told him if he talked to upper management, it would be "the perfect time to tell them about all the bullshit thts [sic] been going on with mitch." SOF 25.

- On September 8, 2017, Plaintiff told Ms. Petrucci that things with Mr. Simmons were only getting worse. SOF 26.

- On September 16, 2017 – months before Plaintiff allegedly rejected Mr. Simmons' advances – Plaintiff sent a text message stating: "I literally can't work for mitch, I can't do it. I'll explain tomorrow, but I think ima apply at lees summit 1." SOF 27.

Again, in order to establish *quid pro quo* harassment, Plaintiff must illustrate that she suffered a tangible employment action because she rejected Mr. Simmons' advances. Plaintiff suffered no employment action at all. To the extent she claims the tangible employment action was constructive discharge, her claim fails both because the conduct was not sufficiently severe to reach the level of constructive discharge, and because the undisputed facts illustrate that Mr. Simmons mistreated nearly all of the Bakery employees. As a result, Plaintiff cannot tie the conduct to the fact that she told Mr. Simmons she does not hook up with all her bosses, and her *quid pro quo* claim fails as a matter of law.[20]

## C. HY-VEE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.

To prevail on a retaliation claim under the MHRA, Plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) there was a causal connection between the protected activity and the adverse employment action. *See Fassett v. Vendtech-SGI, LLC*, No. 16-01221-CV-W-ODS, 2018 U.S. Dist. LEXIS 18902, *20 (W.D. Mo. Feb. 6, 2018); *Brown v. Therapy Mgmt. Corp.*, No. 4:17-cv-01247-JAR, 2019 U.S. Dist. LEXIS, at *9 (E.D. Mo. May 9, 2019); *Johnson*, 2019 WL 252539, at *3.

To the extent Plaintiff's retaliation claim is based on the rejection of Mr. Simmons'

---

[20] Hy-Vee further notes that even after Plaintiff submitted her resignation letter, she continued to work in the Bakery for more than three weeks. SOF 160. She then remained employed by Hy-Vee for another three months. SOF 161. This is completely inconsistent with a claim of constructive discharge. *See e.g. Stafford v. Mo.*, 835 F. Supp. 1136, 1146 (W.D. Mo. 1993) (no constructive discharge in sexual harassment case where employee and alleged harasser stopped working together and the plaintiff did not resign until four months later).

advances, it fails for the reasons discussed in Section B. To the extent it is based on complaints about Mr. Simmons' conduct, she cannot establish the second or third elements.[21] Plaintiff admits she did not make a complaint of discrimination or discriminatory harassment until she provided her notebook to Aimee Douthit sometime after she submitted her resignation. SOF 135. Thus, by the time she engaged in protected activity, the alleged constructive discharge had already occurred. Moreover, as discussed above, Plaintiff cannot establish constructive discharge. Finally, Mr. Simmons had no knowledge that Plaintiff even had notes asserting that he had mistreated her because she had rejected him, let alone that Plaintiff had provided those notes to anyone at Hy-Vee. SOF 137. As such, Plaintiff cannot establish any causal connection between her protected activity and Mr. Simmons' behavior.

## III. PLAINTIFF'S SPOLIATION OF EVIDENCE JUSTIFIES SUMMARY JUDGMENT IN FAVOR OF HY-VEE

As detailed in the Statement of Facts, during her employment, Plaintiff exchanged hundreds of texts with Mr. Simmons. And despite the fact that when she filed her charge of discrimination, she still had the phone that contained those messages, she did not preserve a single one. In addition, Plaintiff points to two phone calls with Mr. Simmons where she claims he inappropriately asked her to have drinks with him. By her own admission, at the time she filed her charge of discrimination, **she had recordings of those conversations**, but she did not preserve them. In addition, Plaintiff's phone records show the following:

- On January 19, 2018, the day Plaintiff's nephew died, she exchanged five texts with Mr. Simmons and had a 58 second call.

---

[21] The case law is unambiguous that a plaintiff must identify concrete act by the employer that resulted in negative workplace repercussions for the employee. *See, e.g., Kader v. Bd. of Regents of Harris-Stowe State Univ.*, 565 S.W.3d 182, 189 (Mo. 2019) (the alleged retaliation must have some adverse impact on the plaintiff before it becomes actionable); *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 799-800 (Mo. Ct. App. 2018) (finding that MHRA retaliation claim failed as matter of law because plaintiff failed to identify any act by employer that resulted in actual negative workplace repercussions). *See also Blockmon v. SW Bell Tel. Co.*, Case No. 1716-CV14128 (Jackson Cty. Circuit Ct., judgment entered April 21, 2020) (recognizing the need for "adverse action").

- On January 20, 2018, she exchanged five texts with Mr. Simmons and had a one minute and 25 second call.

Plaintiff claims one of these calls is the call where Mr. Simmons inappropriately asked her to have drinks, yet she did not preserve the phone calls or text messages from that day. Plaintiff also claims Mr. Simmons invited her for drinks on another phone call later in time and that, on one of these calls, Mr. Simmons invited Plaintiff to his house. Mr. Simmons denies this. If Plaintiff had complied with her preservation obligation, there would be no dispute.

- On March 10, 2018, Plaintiff had a call with Mr. Simmons that lasted over nine minutes.

- On March 14, 2018, they had a call that lasted over five minutes.

- On March 15, 2018, they had a call that lasted over four minutes.

- Plaintiff and Mr. Simmons had regular text messages throughout January, February, March, and April 2018 (and beyond).

In this case, Plaintiff claims that Mr. Simmons abruptly changed his demeanor toward her after the day Mr. Simmons allegedly asked Plaintiff if she hooked up with all her bosses. Plaintiff's testimony varies on when that allegedly occurred, but if we had these phone calls and text messages, we could see for ourselves whether there was an abrupt change in attitude.

- Plaintiff had two phone calls with Mr. Simmons on May 1, 2018. One of them lasted over two minutes. The other lasted over nine minutes.

- Plaintiff had a call with Mr. Simmons on May 6, 2018 that lasted more than 20 minutes.

As discussed above, Plaintiff claims that Mr. Simmons and Mr. Eslick met with her on April 30, 2018 in response to Plaintiff's complaint to Jeff Sesker. This May timeframe is also right in the heart of the time period Plaintiff claims Mr. Simmons was mistreating her. Yet, she did not save the lengthy calls she had with him in this time period. In addition, Plaintiff exchanged hundreds of text messages with Irene Petrucci, Cale Suppes, and Anna Cook that she did not

produce in this case. These text messages occurred both before and after Plaintiff claims Mr. Simmons began mistreating her.

As discussed in Hy-Vee's Motion for Sanctions, filed contemporaneously herewith and incorporated herein by reference, Plaintiff had an obligation to preserve all of this evidence. Her failure to do so has severely limited Hy-Vee's ability to defend itself. As discussed throughout this brief, even assuming the truth of Plaintiff's testimony, Hy-Vee is entitled to judgment as a matter of law. But given Plaintiff's spoliation of evidence, she should not be entitled to that deference. Rather, the Court should grant Hy-Vee the benefit of the doubt in each case where the evidence Plaintiff failed to preserve would have resolved the issue. *See Moyers v. Ford Motor Co.*, 941 F. Supp. 883 (E.D. Mo. 1996) (granting summary judgment in favor of defendant as a sanction of the plaintiff's failure to preserve evidence); *see also Wiatt v. Speed Control, Inc.*, 2002 U.S. Dist. LEXIS 11869 (N.D. Iowa June 28, 2002) ("The spoliation doctrine also authorizes a court to . . . grant summary judgment . . . as a means to level the evidentiary playing field and for the purpose of sanctioning improper conduct.").

Specifically, the Court should assume that the phone calls and text messages Plaintiff failed to produce would establish Mr. Simmons did not treat Plaintiff any differently after the Plaintiff told him she did not hook up with all her bosses as he did before that conversation. The Court should also assume that, consistent with her notes, Plaintiff's text messages and phone calls would have shown that Mr. Simmons treated men and women the same.

Assuming these facts to be true, Plaintiff's claims plainly and undeniably fail as a matter of law.

IV.     **CONCLUSION**

For all of the reasons discussed above, Hy-Vee is entitled to summary judgment on all of Plaintiff's claims, and her Complaint should be dismissed with prejudice.

Respectfully submitted,

*/s/ Jeannie M. DeVeney*
Jeannie M. DeVeney, MO #46885
Jennifer A. Schorgl, MO #71159
LITTLER MENDELSON, P.C.
1201 Walnut Street, Suite 1450
Kansas City, MO 64106
Telephone: 816.627.4400
Facsimile: 816.627.4444
jdeveney@littler.com
jschorgl@littler.com

ATTORNEYS FOR DEFENDANT
HY-VEE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2020, a true and correct copy of the foregoing was electronically submitted via the Court's e-filing system, which generated notice of same to the following counsel of record:

David A. Lunceford
Rachel C. Rutter
LUNCEFORD LAW FIRM, LLC
201 S.E. First Street
Lee's Summit, MO 64063
llf.dlunceford@gmail.com
Rutter.c.rachel@gmail.com

ATTORNEYS FOR PLAINTIFF

*/s/ Jeannie M. DeVeney*
ATTORNEY FOR DEFENDANT